Cordis and Johnson and Johnson, 2008-1973 Would you mind if we move on to this man? Thank you. How may I please the court? My name is Greg Discamp, on behalf of Cordis. In the district court, Cordis' cipher stint was done to infringe the Ding patent. And we think that was an error. There are three separate and independent reasons to reverse that judgment. The cipher stint does not have the non-thrombogenic coating that Ding requires. The cipher stint does not have the drug-free top coat that Ding requires. And the Ding patent is invalid over well-known teachings of the entire art. The problem is that a jury decided all these questions, and there was some evidence which the district court went through and said there was. That constitutes substantial evidence, and so what can we do about it? Well, I don't persuade you what to do about it. Let me start with the non-thrombogenic top coat, which is a pipe-construction issue, so it's a question of law. And actually, if it's correctly construed on the undisputed facts, we do not infringe. The problem with Ding confronted was that objects placed in bloodstream tend to provoke thrombogenic responses. And in particular, stents, metal stents, provoke thrombogenic responses. Ding tried to improve on that problem by providing for a non-thrombogenic top coat. The district court construed the term non-thrombogenic to mean— Non-thrombogenic compared to the bad metal? Well, that's how it should be construed in our view. The district court did not— But where's that in the claim? The claim doesn't say it has to be a better thrombogenic material, non-thrombogenic material, than another. It says simply non-thrombogenic. Well, I think that's the error of the district court, which is to constrain the term non-thrombogenic isolation. The claim language actually— You're saying it's not an absolute term. First, it's not an absolute term, and more specifically, in response to Judge Rader's question, the claim language requires a non-thrombogenic top coat. That provides long-term non-thrombogenicity to the device portion. The device portion is very specifically described in the claim to be at least part metallic. And the claim further provides that the coating must cover at least part of the metallic portion. So it's a very clear recitation that this non-thrombogenic coating must cover at least part of the metal stem. In other words, you're saying non-thrombogenic means less thrombogenic than something, and that something is the bare metal. That's exactly what we're saying. We're saying the claim requires that. And let me point out the error in the district court's approach, which Boston endorses in its brief. The—Boston argues that a non-thrombogenic top coat is meant by any product, such as Slifer, that's permanently implanted in the coronary arteries and in contact with the blood. Did your own in-house Palmer expert, Dr. Llanos, testify that he would have used the same definition? Sure, but he was addressing a different problem than Dick was, and that's exactly the problem with relying on statements like that. Dr. Ding was addressing the problem of a metal stem causing thrombosis. How do we prove that by providing a non-thrombogenic top coat? Llanos was creating a stent that addressed a different problem of pre-stenosis, and Cortis' goal was in addressing that different problem, not to make things worse. So for purposes of Slifer, for purposes of the Cortis product, non-thrombogenic meant no worse than a metal stent, because it was providing this tremendous additional benefit of combating pre-stenosis. You've got to connect— The claim doesn't use comparative terms. It simply says non-thrombogenic, long-term benefits, et cetera. Respectfully, I disagree with you on that. Where does it say longer-term than a metal stent? It says it must provide, give, give long-term non-thrombogenicity to the device portion. Absolutely, and the testimony was abundantly, and the jury found it does. It does not. The Slifer stent is non-thrombogenic for the same reason a bare metal stent is non-thrombogenic. It's dosed with a rich— You want to add a limitation there. It says long-term, longer-term than a metal stent. Respectfully, we don't want to add that limitation. I think that's what Ding is talking about. The evidence was undisputed that the Slifer stent is as bad, essentially, as the bare metal stent on this component. Maybe you should go on to your substantial claim. I'd be happy to do that. The next element is the topcoat must be substantially free of drug. Ding requires substantially free topcoat in order to delay immediate release of drug. Is there any drug in the topcoat that you apply to your product? No, sir. That was the problem with their claim application argument. We spray on a drug-free topcoat. Immediately after it is sprayed on, because of the selection of polymers and solvents that Cordis makes, there's a leaching. The question is, where does the claim tell us that the timing of doing the analysis of whether there is any drug in the topcoat? The claim requires two elements. One, it requires a drug-free topcoat, and it requires a drug-free topcoat in a medical device that is implantable on a patient. That's where the combination comes. Where is there anything in the record that tells us that it isn't implantable at the moment you spray on the topcoat? Every doctor who testified said that. There's no contradictory evidence. Implantable means only implantable some time in the future. Why wouldn't, at the time this is conceivably implanted, it would still be substantially free? That would be like saying a nail is implantable. You could do it. It would just kill the patient. This is a medical device. Just because it's a medical device doesn't mean that it has to work or be done properly. It doesn't have to be done properly. These medical devices are designed as something that will work effectively. It does have to be implantable on a patient. Ding-Dong Patton talks about sterilization. How soon does the leaching occur? Instantly. It does it instantly, and that's why Austin's entire case is, for moments, the topcoat is drug-free. As it's sprayed on, it's a wet, non- It's not a medical device. It's a medical device in the process of being manufactured. The product must thereafter- The solvents must be evaporated. It must be dried. It must be cured. It must be sterilized. By the time it is a medical device, being approved by the FDA to be sold and placed in humans, meaning a product that a doctor would place in humans, the topcoat is called drug. That's an undisputed fact. And under the all-elements rule, there is never a time when the topcoat is free of drug and it's a medical device. And exactly the trial, was that the issue that led the jury astray, in your view, or was it the substantial part of it? I think that is exactly the issue that led the jury astray. If you read the arguments, they were all about essentially manufacturing-step arguments. I think the jury got it wrong because the case was tried as though this were a method of manufacturing a claim, and that just was off-base. How about the wolf- Excuse me. How about wolf in relation to invalidity? I'd be happy to talk about wolf and invalidity. I think this patent is plainly invalid. Wolf and Don are both excellent examples. Wolf provides two embodiments, a multiplicity of embodiments. It has a metal stent with a drug topcoat. Right next to it, figure 4, figure 3B, there's a polymer stent containing drug and a drug-free topcoat. The patent explains that the drug-free topcoat is a diffusion barrier. If you wanted a diffusion barrier on your metal stent with a drug, you'd add that. Is there an issue as to whether there would be non-rhombogenicity in the wolf topcoat? No. The wolf topcoat is silicon, and silicon can be porous, and thereby rhombogenic. No, no, no. Silicon is recognized in the- It depends upon the kind of silicon, and that isn't really specified by wolf. Respectfully, to those of you who argue silicon is non-rhombogenic, that's the unequivocal trial testimony. There's no dispute about this at trial. There's a gap in the fact argument made up by Lawson. Let me ask you about this. Is your obviousness question influenced or affected by which way we came out on claim construction? No. For example, doesn't your, on the one hand, which a lot of people are forced to do, arguing for a narrower claim construction, but doesn't that detract from the wolf pack? No, the only claim construction issue that we're presenting is the non-rhombogenic issue. The only claim construction issue is does it require comparative non-rhombogenicity reduction, or is it sufficient that it, in some amorphous way, be non-rhombogenic? I mean, sort of in relationship to Judge Rader's question, wouldn't you be on easier ground with respect to silicon if you adopted the district court's claim construction as opposed to the one that you're advocating? Actually, no, although I think the district court's claim construction makes it easy. But the argument that Judge Rader was just espousing was one Boston espoused only on appeal. It's not an argument. It's supported by the trial record. Judge Rader espouses no argument. I'm sorry. I didn't pose a question to you, that answer. Let me ask you what you do with the secondary considerations. Secondary considerations all run our way. I mean, basically, you've got the Cypher stint, which was a great success. By the undisputed testimony, it was a great success because it identified the drug rapamycin, which treats restenosis. It had nothing to do with anything in dealing. There was no long-felt need for how to come up with coded stints. You see Ding, you see Wolf, you see Don. There are dozens of ideas. When Cordes came upon Cypher, it was easy for it to create the drug-coded surface. That was child's play. The validity arguments are extraordinarily strong. Don was just as strong as Wolf. And Tom's exactly the same idea. It's a medical device for esophageal or bronchial stints. It's got a drug. Its underlip coating has drug in it. Its top coating is silicon. Its top coating is drug-free. And their only argument at trial, which they repeated on appeal, was that one of skill in the art wouldn't know that an esophageal or bronchial stint could be made of metal and have an open lattice structure. Boston itself had approval for such a stint. Now these are essentially laughable arguments to those of skill in the art, and skill in the art was very, very odd. Thank you. We'll stay for the rest of your arguments. Thank you.  May it please the Court. Now, there was one point that Mr. Dyskant started with that I'd like to address and correct. And that's his statement that Boston Scientific's, quote, entire case is that the moment it's sprayed on, it's drug-free. And that's just simply not correct. There was testimony both by Dr. Hoffenberg, who is BSC's expert witness, and also court's witnesses. That is to the amount of drug that moves into the top coat following the application. Is there any question that it's 23% and almost very quickly after it's sprayed on? That's not clear at all in the record, Your Honor. In fact, the testimony by Dr. Hoffenberg about point two, which Judge Rodley referred to. Please do. Okay. So this, Your Honor, is on page, in the record, A1033. The transcript page is 756 to 757. This is on cross-examination, where Dr. Hoffenberg says, at the point where we have an implantable device that doesn't have 23% in the top coat, it has numbers like Mr. Diskant was speaking about, maybe 1% or 2% or a very, very small amount. At what point is that? I'm sorry? At what point is that? You use the claim language, implantable, but what time is that actually? If you look at the transcript, Your Honor, I think it shows that the conclusion of the manufacturing process after it's been treated with the solvent. So you have to sterilize it so there's a period of time there, and then you have to let the solvent dissipate, and so there's a period of days, right? I don't believe the record says how long that period takes. What there is, which is important. So what are you saying is the implantable? When is it implantable? Well, Dr. Hoffenberg's testimony is that it's implantable when the manufacturing process is completed, which is when the top coat has been applied, it's been smoothed with the toluene. And that was his testimony, and he's applied before it's plain construction. So how long is that into the process? That's right when it's manufactured. The 23% number is very clear from the record. And that number, by the way, came from Dr. Hoffenberg's evaluation of the elution data, the fast and the slow curves, the green and red that you talk about, which is included in our brief at page 51. He said it eventually got to 23%. This is the transcript. It's A978, transcript page 636. So the proposition that as soon as the manufacturing process is complete, you get to 23%, is not so clear by the record. What Dr. Hoffenberg is talking about is this device that was tested in the coronary organs of pigs that obviously had been manufactured sometime previously. I think it's also important to note on this topic, Dr. Hansen, who was Cordes' expert witness, testified in the record at page A1344, or transcript page 1499, that when the solvent is applied with the top coat, a little bit of redistribution occurs. A little bit is a direct quote. That's his phrase. Many testified on the same page that when the device was dried, it, quote, tends to pull some drug into the top coat, and it's very likely that it pulls up some drug, quote, to some extent. And then again, when he gives his opinion of non-infringement, he talks about sterilization, and he says, quote, some drug, close quote, is in the top coat. I'm looking at 1033. Can you show me again where there's testimony that makes it clear when the device is implantable and what the percentage is at that point? Okay. On the top of the page, on 756, at the top, starting around line 2, where the answer to the question is. In the context that we're speaking here, sir, at the point where it's implantable, and that means at the point where the manufacturing process is complete, it would not be 23% of the top coat. Then on the same page of the appendix. Who's that responding? That's Dr. Hoffenberg on cross-examination by Mr. Discan. How much would it be at that point? Does he ever say it? What he does a little bit further down on this same page, the transition from page, transcript page 756 to 757, starting around line 22. What I'm absolutely sure of is that when you actually manufacture the device and create an implantable device which uses a drug-free top coat, that's the point where we have an implantable device. It doesn't have 23% in the top coat. It has numbers like Mr. Discan was speaking about. Maybe 1% or 2% were very, very small down. Isn't the trouble here how we define implantable? Because wasn't it undisputed by the experts, including your own, that you wouldn't implant a stent prior to sterilization? It seemed from the medical experts that people agreed that you would not put a cardiac stent in a person without sterilizing. But you seem to be arguing that it is implantable even without sterilization. That's correct, Your Honor. And there's two points that I would like to make on that. First of all, the application of the claim construction to the set of facts is appropriately a question of fact for expert witnesses. And Dr. Hoffenberg, who's qualified as an expert and testified to that, is a case that I would point the court to and I think is valuable on this point. But we can look at this as a question of law, claim construction, as to whether there is substantially free implantable point, right? Well, it can be sometimes hard to draw, Your Honor. It is hard to draw in this case. Right. The case that I would like to point the court to that I'm deferring, Your Honor, Judge Crowe, is Cordes v. Medtronic, which is 339 F. 3rd, 1352. In that case, the claim required that the connector members also, in this case, that the connector members be substantially parallel to the cylindrical members that would be connected. And the device, in fact, undisputedly, had connector members that were longer in the opposite direction. And this went to the jury. Of course, expert testified that the shape was not important, but the way to look at it is to draw a line between the members that are connected. And when you do that, you see the short access is substantially parallel. But what I think is important is the court's discussion of that. This is on page 1363 of the decision, where the court clearly treated that as a question of fact, said that the jury was entitled to credit that testimony in terms of how to apply the claim construction to the device. How do you apply WOLF? WOLF, Your Honor, one point that I would certainly want to start with is that it is a record during prosecution. Now, the testimony that we are looking at, that WOLF has two layers of polymer which both contain drug in Figure 3B. It states that the outer layer is erodible. And it also, this is on page 989 of the appendix, And is the outer layer silicon? I don't recall what all the outer layers were disclosed in WOLF, but I do recall that WOLF specifically teaches that erodible polymer, which is obviously precluded by the characterization of the top coat in the helmets and ding pad. The testimony by the experts on this is in 989 and 1429, both ESC's expert and Cordes' expert agree that WOLF does not teach a metallic step that has two coatings. Rather, there's an embodiment here, there's a polymer step that has a coating, but there's not one with it. Also, Your Honor, the court asked Mr. Diskin about secondary considerations, which is something that I wanted to address. Well, let's go back to this one. Under KSR, we're kind of required to extrapolate a little. I didn't understand your point because it's got one embodiment that does one thing and then does the other thing. You can't sort of go to the second step and say that it would have been obvious to do both at one time. I don't think you can say that it necessarily would be obvious or that it necessarily would not be obvious. But in any event, when you look at the testimony that Cordes replies on, the Cordes expert witness really just went through and showed elements of the ding helmets claims in different pieces of the prior bar and then just said, well, it would be obvious to modify, it would be obvious to change, with no explanation as to why. And although KSR certainly emphasized that we do not have a rigid test for motivation and combination, it does not absolve a person challenging validity of the obligation to provide persuasive testimony as to why a person skilled in the art would make the change or would make the modification or the combination. And that simply was not here. With respect to secondary considerations, Mr. Diskamp, on argument, said something to the effect that it was undisputed that the success was the drug selection, which is sirolimus, also known as rapamyze. But there was specific testimony, again, in the record by Dr. Hoffenberg. This is on page 1056 of the appendix. He talks about how the success and utility of the cipher stamp also depends on the controlled release of the drug, which is the results from the membranes and from the use of the claimed intervention here. There was also substantial evidence of long-felt need and tried-and-failed. Three of the prior art references the court has principally relied on belong to Medtronic. And yet Medtronic was going all along in a different direction, which was trying to do erodible polymers, which become rough, are not biostable, have pores that track the flavor and generate clots and therefore are not non-drug-related. And in fact, Cordes was doing that as well. The testimony was that their internal development people was that they were going down that road for a long time using erodible polymers. The Wolf patent explicitly discusses the problem of thrombosis and the need to combat it. Why would the jury come to the conclusion that there was an absence of thrombogenicity in Wolf? Wolf does not talk about using a dual-layer coating. Yeah, but you've got 3B right next to Figure 4 patent, and so we're right back where Judge Cordes had you a minute ago. Why can't you just take the drug component of 3B and plug it into Figure 4? Perhaps a person who might make that argument might do it, but there was testimony in the record that the differences between metallic spents and polymer spents, how you coat them, why you coat them, and when you control release were all meaningful. And this went to the jury under an undisputed claim construction. I'm sorry, under an uncontested jury instruction on obviousness, which the court held not that long ago in another Cordes case was perfectly consistent with KSR. It is unreviewable as invited error, which is what the court held in that case as well. Did the instruction require specific finding motivation to identify specific teaching motivations? What it required, Your Honor, it did. Well, it said that it could come from the knowledge of a person of skill and knowledge is what it said. And that was specifically the sentence that the court cited in the Cordes case that I referred to a moment ago, which is Cordes B. Medtronich, another one, same name, 511 F. 3rd 1157, my wrong. I don't get the exact phraseology that was used in that case, which was used in this case. Can I jump back to another point? Certainly. How can you have an implantable device before it's sterilized? Implantable. You wouldn't implant something that's going to kill a patient. Well, implantable here, I think, clearly refers to the character, to the geometry, to the structure of the device. There's a statement in the specification that I would point to. Implantable means capable of being implanted. I don't think there's any problem with that interpretation. No, I don't think there is, Your Honor. So is it something which can be implanted? You're not going to implant an unsterilized device, are you, an incomplete device? Well. And therefore, you've got to go through the sterilization. Doesn't that take your Dr. Hoppenberg testimony off the table? Well, I can make two brief points on that, Your Honor. I see my time is up. First, I want to just point to the portion of the specification that I was alluding to, which is column 3, around line 12, where it talks about the devices that can benefit from this. It talks about extracorporeal circuits, like in a dialysis machine or a barista's machine, that are outside the body. And, in fact, one of the prior references that was talked about was that. Get to my question. Okay. Implantable or not before it's sterilized? It is physically implantable. So the claim that you're saying is that. How does it mean? You're advocating implantation of a non-sterilized product. I'm certainly not advocating anything. And there's no question that when a device like this is used in people, it should be and must be sterilized. And can it be implanted before that? Yes, it can be. That sounds to me like you mean physically, so it's not medically ready. That would be correct, Your Honor. And the other point that I would just briefly make in response to Your Honor's question is even if we look at when does it have to be sterilized, et cetera, we still have a make infringement in this case. Make, use, sell. There may not be a sale infringement, depending on when it leaves the warehouse, but we clearly have a make infringement, and that is sufficient. And it's sufficient to affirm the jury's verdict. Okay, if there's no other questions, I'd like to introduce the witness. Mr. Blissman, there's a little bubble time. Thank you. You don't have a make infringement no matter what? No, they don't. We didn't. You still have to make an implantable device. It can't be made until it's sterilized. I don't understand the argument at all. I have a thermometer at home. Once in a while I get a fever. I take my temperature and I put it aside. Maybe my wife has something, too, so she picks it up. It is implantable in the mouth, even though it hasn't been sterilized, right? Yes, yes. It is implantable. That is, but a stent isn't. A stent must be sterilized. Oh, she doesn't want to pick up my disease. The longer I put it in her mouth anymore, the more I'm sterilized. Yeah. Well, this is not a patent. To me, the patent itself tells you the answer. I mean, Ding is talking about the medical device. Ding shows a diagram to make the medical device in Figure 1, the last step in sterilization. In Column 9, Ding says, Stents coated and cured in the manner described need to be sterilized. I don't think there's a serious doubt that a medical device of this patent is a sterilized medical device. And if it is a sterilized medical device, that case, their infringement case, disappears. If I could just spend a moment on the KSR point, and then I'll sit down. I think this is a very simple, straightforward KSR case. This is not rocket science. Frankly, it's not rocket science for the people in this courtroom to read, Wolf, and understand. You can put the diffusion coating on top of the metal stent. We deal with rocket science all the time. I'll stay away from my analogies. The art here is very high level. These are Ph.D. scientists working in this field, working with polymers, containing drugs, working in blood-contacting environments. They all testified at trial. Probably the entire court testified at trial. They all learned about diffusion coatings in graduate school. This is not sophisticated stuff. Adding a diffusion layer to slow down the release of a drug from a drug-containing layer is a one-on-one course in grad school. These Ph.D. scientists all knew it. And I think it's very important for you to take a look at the testimony opposite ours. It all came from Dr. Huffenberg, who used the wrong level of skill in the art. There is, I think, no serious rebuttal to the evidence that, as a matter of law, this court performing its legal obligations under KSR, this is simply the combination of known elements for their known functions, achieving predictable outcomes. The patent should be declared invalid. Thank you very much. Thank you. This hearing is adjourned.